# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs August 2, 2011

## STATE OF TENNESSEE v. LEDARREN S. HAWKINS

**Direct Appeal from the Circuit Court for Madison County**
No. 09-253     Roy B. Morgan, Jr., Judge

_____

**No. W2010-01687-CCA-R3-CD  - Filed February 16, 2012**

_____

A Madison County jury convicted the Defendant, LeDarren S. Hawkins, of first degree murder and tampering with evidence, and the trial court sentenced him to serve an effective life sentence in the Tennessee Department of Correction.  On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that the trial court refused to instruct the jury regarding the defense of a third person as an affirmative defense.  After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Joseph McClusky, Memphis, Tennessee, for the appellant, LeDarren S. Hawkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; James G. Woodall, District Attorney General; Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant shooting and killing the victim, Jerome Ellington, and, thereafter, disposing of the shotgun he used in the commission of this offense.  Based on this conduct, a Madison County grand jury indicted the Defendant for

1

first degree premeditated murder and tampering with evidence. The parties presented the following evidence at the Defendant's trial: Clifton Ellington, the victim's father, testified that the victim was nineteen years old and enrolled as a student at Lane College at the time of his death. Mr. Ellington recalled that, on January 28, 2009, he was called to Jackson-Madison County General Hospital where he identified his son's body.

Rusty Ballentine, a Jackson Police Department officer, testified that, at approximately 10:20 p.m. on the night of January 28, 2009, he responded to a "shots fired" call at the Jackson Family Fun Center. Officer Ballentine said that, when he arrived at the scene, he observed people running and jumping the fence toward an area on the property where patrons could play "putt-putt" golf. After parking his car and approaching the building, a man wearing a brown coat told the officer that his friend was dying. Officer Ballentine followed the man into the bowling center to the karaoke bar area, where he observed the victim lying in a pool of blood on the ground behind the bar. The victim was unconscious and not breathing, so the officer performed CPR on the victim until paramedics arrived.

Steven Story, a Jackson Police Department crime scene technician, testified that he reported to Jackson-Madison County General Hospital to photograph the victim and recover any personal effects. The items collected included: one pair of black socks, one pair of black Nike running shoes, one pair of Fruit of the Loom underwear, one pair of black shorts, one pair of blue jeans with a belt, one gray pullover shirt, one bloody white t-shirt, one black t-shirt, a wristband from the bowling center, an AT&T cellphone, a container of Carmex lip balm, a set of keys, $5.09 in cash, a condom, and a wallet. Officer Story testified that he did not recover anything on the victim's body to indicate the victim was in possession of a handgun or any other weapon that night.

Dr. Staci Turner testified that in January 2009 she worked as an assistant medical examiner for Forensic Medical, which served as the Davidson County Medical Examiner. Based upon her education and experience, Dr. Turner testified as an expert in the field of forensic medicine. Dr. Turner testified that, during the course of her employment with Forensic Medical, she performed an autopsy on the victim. Upon examination, Dr. Turner determined that the victim was six feet tall and weighed 217 pounds. The most notable injury was a large gunshot entrance wound, from a shotgun, located on the victim's right upper chest area. Dr. Turner testified that it was "unlikely" that a person would survive after sustaining a wound of this nature. A toxicology report indicated the presence of a small amount of alcohol, which could be attributed to either the equivalent of one beer or alcohol generated as part of the decomposition process of the body. Dr. Turner testified that the cause of death in this case was a shotgun wound to the chest.

Andy Kim, the general manager of the Jackson Family Fun Center, testified that the Jackson Family Fun Center was equipped with security cameras. Kim said that he

provided the State with the video footage for the date and time relevant to this case. On a map of the Jackson Family Fun Center, Kim identified a karaoke bar located inside the main building with an adjacent patio. Outside the building was a "putt-putt" golf area lined by a four-foot tall black metal fence. Kim said that he was present at the Jackson Family Fun Center at the time of this incident but did not see anything related to this incident firsthand. When Kim first learned of the incident, he went outside and observed "a lot of people running away from [a] silver car." Initially, he was told to look for an older model blue Bronco. He found a vehicle matching this description, stopped the vehicle, but he allowed the vehicle to leave the parking lot because he could not determine the occupants' involvement.

Hayley Brown testified that on, January 28, 2009, she worked at the Jackson Family Fun Center. Her husband, Luke, was not employed at the Jackson Family Fun Center but would "help out from time to time." Brown recalled that she covered the bar for the bartender while he stepped out to take a smoke break. Brown then covered for her husband who checked patrons' identifications that night. While doing so, she became aware of "a problem," so she notified other employees and then went outside to check on "the problem." When she went outside, she observed a group of fifteen to twenty people "hovering around." She watched as a man was punched in the face, kicked in the back, and dragged to the ground. She described the man as between 5'8" and 6'1," "a little husky," and wearing a navy blue shirt. Although Brown never saw a weapon, she heard a gunshot. The bartender instructed her to go inside and turn off the music, and she complied. Once inside, Brown observed the same man that she had seen punched, kicked, and dragged to the ground lying behind the bar bleeding.

Clint Collins testified that on January 28, 2009, he worked as a bartender at the Jackson Family Fun Center. At about 10:22 p.m. a fight broke out in the parking lot, so Collins went outside to try to break up the fight. Collins said that there was a large group of people straight out in front of the door to the karaoke bar. He yelled for the parties to stop, but he said the fight "was way more than what any one person could take care of." Collins heard gun fire and then saw a black man with dreadlocks. The man wore a red jacket and a red hat, and he held a "cut off" shotgun. Collins described the jacket as "maybe a Dale Earnhardt or a Dale Earnhardt, Jr., the Budweiser jacket." Collins watched as this man fled toward "45."[1] Collins went inside the karaoke bar and called 911. While inside, he saw a man lying on the ground behind the bar with blood coming from his chest. Collins testified that the only weapon he saw that night was the shotgun.

Collins testified that, earlier that same evening, the man with the shotgun had been asked to leave the karaoke bar twice because he was underage. Collins testified that the sawed-off shotgun police recovered near the "putt-putt" golf course was "consistent with

---

[1] For the purposes of this opinion, we assume that "45"is a road near the Jackson Family Fun Center.

what [he] saw" that night.

Collins narrated the events, which were consistent with his testimony, as the State played the security video recording for the jury. The video depicted Collins entering the karaoke bar and showed that, soon thereafter, a man entered the karaoke bar and fell behind the bar. The video depicted Collins on the phone calling 911 while others attempted to aid the injured man. Officer Ballentine arrived and performed CPR on the injured man and then paramedics arrived.

Kyan King testified that on January 28, 2009, he worked at the Jackson Family Fun Center as the night manager. King said that, at some point that night, he learned of "a problem" out in the parking lot, so he went outside and saw two groups arguing with each other. He attempted to "settle them down," but the argument turned physical. King said that he saw the Defendant get out of a blue Chevrolet Blazer holding a sawed-off shotgun at his side. The Defendant walked through the crowd "look[ing] for one guy and shot him." After seeing the Defendant fire the shotgun, King ran inside the Jackson Family Fun Center to radio that shots were fired and to call police. King said that the Defendant's hair was in dreadlocks, and he wore blue jeans, a red Budweiser jacket, a red shirt, a red hat with a white "C" on it, and a gold chain. The State played the security video recording for the jury, during which King narrated and identified himself in the footage.

On cross-examination, King identified the victim in the case on the security video recording. King agreed that, on the footage, the victim punched another man, but King explained that he did not see the punch at the time of these events.

Darrell King, a Jackson Family Fun Center employee, testified that he worked the night of January 28, 2009, and witnessed portions of the altercation. Darrell King went outside and saw a large group of people and noticed the Defendant wearing a red Budweiser coat, a red hat, and carrying a sawed-off shotgun as he exited a truck. Darrell King agreed that the weapon police officers later retrieved appeared to be consistent with the weapon he saw that night. Darrell King watched as the Defendant walked into the crowd and up to a specific person and shot him. After the Defendant fired the shotgun, everyone ran, including the Defendant, who ran back through the parking lot toward the "putt-putt" golf course.

The State played portions of the security video recording, and Darrell King identified himself, the Defendant, and the truck on the footage. Darrell King said that he did not see a gun, other than the Defendant's sawed-off shotgun, that night.

Roni Jefferson, a Lane College student, testified that he was present during the shooting at the Jackson Family Fun Center, which occurred after he arrived there with his cousins at about 8:30 p.m. Jefferson said that he had known the victim since middle

4

school and that he saw him at the Jackson Family Fun Center that night. At some point in the evening, an altercation occurred in the parking lot. Jefferson said that he went outside and saw a fight, which he described as "a big commotion." Jefferson did not know how the fight began or who started the fight. Jefferson recalled that he saw a man with dreadlocks wearing a red and black jacket, red hat, and red shirt carrying a sawed-off shotgun. Jefferson identified the weapon police officers later recovered as the one he saw the man carrying that night. Jefferson watched the man walk toward "the commotion" with the gun held down to his side. Jefferson said that, after seeing the shotgun, he ran back inside the building and thereafter heard a gunshot. Upon hearing the gunshot, Jefferson ran toward the "putt-putt" golf course until he saw the man with the shotgun running toward the course, which prompted Jefferson to return back inside the building.

The State played portions of the security video recording, and Jefferson identified himself, the victim, and the Defendant in the footage. Jefferson testified that he spent time with the victim that night and that he did not, at any time, see the victim with a gun.

Terry Mays testified that he had known the victim for approximately five years. Mays recalled that, on the night of January 28, 2009, he met his friend, Roni Jefferson, at the Jackson Family Fun Center. Mays said they "h[u]ng out" with multiple people that night, one of whom was the victim. During the course of the evening Mays became aware of a "problem" between the group he was with and another group of people from Memphis that were also at the Jackson Family Fun Center. The "problem" continued and, ultimately, both groups went outside to fight. Mays said that he did not go outside with the others at first, but went out a little later. Mays saw the victim hit someone and, "a couple of seconds" later there was a gunshot. Mays testified that he saw the Defendant holding a sawed-off shotgun at the victim's chest, but he did not actually see the Defendant pull the trigger on the gun. Mays recalled that the Defendant had dreadlocks and was wearing a red jacket and jeans that night.

Mays identified the sawed-off shotgun police officers later recovered near the scene as the one he saw the Defendant holding toward the victim's chest. Mays said that he ran over to the victim and initially could not tell where the victim had been shot. When the victim coughed, however, blood poured out of his chest. Mays helped the victim inside the building to the bar area. Mays said the victim collapsed on the floor once inside, "got back up again for a couple of seconds and laid back down again." Mays said that he did not see the victim with a gun at any time during the night.

Everett Conley testified that the Defendant was a "close friend" of Conley's cousin, Marcellous McKinney. Conley said that in January 2009, he was enrolled as a student at Lane College. "A couple of days" before the shooting, the Defendant and Marcellous McKinney came to Conley's apartment. While at his apartment, Conley saw the Defendant pull a shotgun out of his pants. Conley identified the shotgun police officers

5

recovered at the crime scene as the same shotgun the Defendant had at Conley's apartment several days earlier. Conley said that, after pulling the gun out from his pants, the Defendant said, "You wouldn't even know . . . I could carry this around and you wouldn't even know, you know what I'm saying, that I got this. You wouldn't be able to tell." Conley testified that the Defendant spent one night at Conley's apartment and that he did not know where the Defendant spent the remaining nights while he was in Jackson.

Conley said that, on the night of this incident, Conley was with a friend at "The Shack" on campus when McKinney and the Defendant arrived and suggested they go to the Jackson Family Fun Center. Conley drove his GMC Jimmy truck to the Jackson Family Fun Center while McKinney, the Defendant, Billy Cole, and "Herm" all rode with him. Once inside, they began bowling and "just having a good time." Conley began talking with the victim and some of the victim's friends when a man Conley did not know approached the group and began "yapping at the mouth" saying he was a "gangbanger, too."

Later in the evening Conley, McKinney, the Defendant, Cole, and Herm prepared to leave. As they exited the building, Conley "threw a sign up" for the gang the "Crips." He explained that he used to be a Crip and that the victim's "people" were Crips. Conley said that his "family," however, were all affiliated with a different gang, the "Blood[s]." Conley was unaware of whether anyone else from his group threw up a sign. As they were headed toward Conley's car, the unknown man who had approached earlier followed the men, continuing to use threatening language. Conley said "the problem continued" and, at some point, he was "drawn into it." Conley recalled that the victim hit his "baby mother little cousin" in the face, and a fight ensued. Security guards approached the crowd with taser guns and Conley heard a gunshot as he was telling the security guards not to "shoot" because he was trying to stop the fight. Conley ran back in to the bowling area and then out a side door and into the woods. Ultimately, police officers picked up Conley as he was walking down a street.

The State played portions of the security video recording, and Conley identified himself, the victim, the unknown man, the Defendant, Herm, McKinley, and Cole on the footage. Conley said that he did not see a gun, other than the Defendant's sawed-off shotgun, that night.

Marcellous McKinney testified that he and the Defendant were "close friends." McKinney said that in January 2009, the Defendant came to visit McKinney and to "check out" Lane College where McKinney was enrolled as a student. McKinney had his own house at the time, but the Defendant stayed at Conley's apartment while he was in Jackson. During the Defendant's visit, McKinney saw the Defendant with a shotgun one time. McKinney identified the sawed-off shotgun police officers recovered as the shotgun he saw at Conley's apartment. McKinney said that he saw the shotgun in Conley's closet,

6

and the Defendant told him that he had "found the gun."

McKinney testified that, on the night of January 28, 2009, Conley drove McKinney, the Defendant, Lorenzo, Cole, and Herm to the Jackson Family Fun Center in Conley's blue truck. McKinney described the Defendant as wearing a red Budweiser coat and a red shirt and said the Defendant wore his hair in dreadlocks. They met another group who were bowling and "h[u]ng out" with them. McKinney said that, during the course of the evening, there was hostility between his group and another group. McKinney said that one of his friends bowled a strike and then threw a symbol representing his affiliation with the Blood gang. McKinney speculated that this might have created some of the hostility between the two groups because the other group was affiliated with a different gang, the Crips.

McKinney testified that the group he came with decided to leave. As they left, McKinney "threw up [a] Blood [sign]." As he walked toward Conley's truck, a group of the Crips approached to fight Conley. McKinney said that the men who approached were "talking" and "getting aggressive." McKinney, realizing his group was outnumbered, went back inside the bowling alley to get more people. When he returned, a punch was thrown, and the fight broke out. At some point, McKinney heard a gunshot, looked up and saw Conley's truck, so he ran and got into the truck. McKinney drove the truck to the front entrance of the Jackson Family Fun Center and waited to see "where everybody was at." Herm and the Defendant appeared, and then a police officer approached McKinney but allowed him to leave shortly thereafter. McKinney drove to a nearby apartment complex.

McKinney testified that he, Herm, and the Defendant waited outside at the apartment complex while McKinney's brother, Lorenzo, returned to the Jackson Family Fun Center to find Cole and Conley. As they waited, it began snowing, so they knocked on an apartment door and asked a Caucasian man, who answered the door, if they could use a phone. The man agreed, and the Defendant arranged for "DeAngelo" to pick the three men up at a Kroger grocery store near the Jackson Family Fun Center. The man who allowed the Defendant to use his phone gave the three men a ride to the Kroger grocery store. While still at the apartment complex, McKinney noticed a cut on the Defendant's hand but "didn't ask anything."

McKinney testified that they entered the Kroger and waited in the back near the restrooms. While waiting, McKinney asked the Defendant about the injury to his hand, and the Defendant responded that, "[t]he gun did it." McKinney testified that, although he had no knowledge of the Defendant firing a gun that night, he believed the Defendant was referring to the sawed-off shotgun when he made the statement. About ten minutes later, DeAngelo and "Portia" arrived to pick them up in a burgundy Nissan.

7

Rachel Storey testified that on January 28, 2009, she lived at North Ridge Apartments with her four-year old son and her younger brother, Nicholas Thweat. Storey said that this apartment complex was located near the Jackson Family Fun Center. Storey recalled that about 11:00 p.m., on the night of January 28, as she watched television with her brother, she heard a knock on her door. Storey's brother answered the door, and the Defendant, wearing a red hat, red shirt and blue jeans, stood at the front door and asked to use a phone. The Defendant made a phone call and then another black man, who Storey described as "a tall heavyset young man," appeared and also made a phone call.

Storey said that the Defendant explained to her that there had been a shooting at the bowling alley, and he had lost the group of people he had been there with because everyone scattered after the shooting. Storey noticed an injury to the Defendant's right hand, for which she gave the Defendant a "rag." After the Defendant contacted someone, Storey's brother offered to take the men to the nearby Kroger grocery store where the Defendant had arranged to meet a friend. Storey said that, after her brother left, she became "nervous," so she called the Jackson Family Fun Center to confirm the Defendant's story. The employee who answered the phone referred the phone call to a police officer, who subsequently sent police officers to Storey's apartment to take a statement. Later that night, Storey identified the Defendant in a photographic line-up as the man that used the phone at her apartment.

Nicholas Thweat testified that on the night the Defendant appeared at the door requesting to use a phone, Thweat lived with his sister in the North Ridge Apartments. Thweat said the Defendant wore a red shirt, red hat, and blue jeans with a red belt. While the Defendant made "a few" phone calls, Thweat noticed that the Defendant had a cut on his hand. After a few minutes, another man walked up and used Thweat's cellular phone too. After the Defendant and other man finished using the phone, Thweat offered to give the men a ride. After dropping the men off at a nearby Kroger grocery store, Thweat returned home where police officers were speaking with his sister. That night Thweat identified the two men in a photographic line-up.

Lataisha Williams testified that on the night of January 28, 2009, she was working at Kroger when three black men entered the store, one of whom was the Defendant. She recalled the Defendant had his hair in dreadlocks. The three men went to the deli area of the store and remained there for approximately an hour. Williams said that she was outside on "a smoke break" when the three men left the store and drove away in a maroon Nissan Sentra.

Lieutenant Mike Turner, a Jackson Police Department officer, testified that he responded to an incident at the Jackson Family Fun Center on January 28, 2009, to take pictures and collect evidence. Lieutenant Turner photographed a 1999 blue and gray GMC Jimmy which was located in the parking lot. This truck was taken for further

8

processing and police officers recovered a red Budweiser jacket from the passenger side rear seat. Lieutenant Turner also identified a photograph of a sawed-off shotgun that was lying in the fenced-in area outside of the Jackson Family Fun Center. Lieutenant Turner testified that the shotgun was processed for finger prints and no identifiable fingerprints were found on the shotgun.

Travis Vanover, a Jackson Police Department officer, testified that he responded to a "shots-fired" call at the Jackson Family Fun Center. Officer Vanover explained that he had both a vehicle and suspect description for this incident. Police were looking for a blue GMC truck and a black man with dreadlocks, wearing a red ball cap and a red Budweiser racing jacket. As he approached the Jackson Family Fun Center parking lot, he saw a blue truck with a black man with dreadlocks in the driver seat. Based upon the suspect and vehicle descriptions, Officer Vanover approached the driver's side of the vehicle and noticed a red Budweiser racing jacket lying on the back seat. Upon further investigation, Officer Vanover found the Defendant's driver's license in the Budweiser jacket pocket.

Lieutenant Vanover testified that, after processing the scene, more information was released indicating the suspect might be in a maroon Nissan Sentra. Patrol officers stopped a vehicle matching this description and, shortly thereafter, Lieutenant Vanover arrived at the scene and spoke with the four occupants. Lieutenant Vanover recalled that "none of their stories were adding up," but he learned of an address, 447 North Hays, where, one of the occupants of the Nissan Sentra claimed, they had "dropped her friend off." Lieutenant Vanover proceeded to the address and DeAngelo Johnson answered the door and gave consent for the police officers to search the residence. In the front bedroom closet, police officers found the Defendant.

Chris Chestnut, a Jackson Police Department officer, testified that he reported to 447 North Hays where police officers had taken the Defendant into custody. Officer Chestnut testified that a towel with blood on it, a bottle of peroxide, and a red baseball cap with a white "C" were collected from the bedroom in which police officers found the Defendant hiding in the closet. After patrol officers transported the Defendant to the county jail, Officer Chestnut went to the jail and collected the red shirt, white t-shirt, jeans with a red belt, black athletic shorts, silver necklace, and red bandana that the Defendant was wearing at the time of his arrest.

Officer Chestnut testified that he submitted the following items to the Tennessee Bureau of Investigation ("TBI") for DNA and gunshot residue analysis: two buccal swabs from Ledarren Hawkins, a red NASCAR jacket, a red T-shirt, and a white T-shirt, a pair of jeans with a red belt and a red bandana attached, a gray pullover shirt, a black T-shirt, a Springfield Model 107 Savage Arms twelve-gauge shotgun, and two swabs taken from Thweat's cellular phone.

James Russell Davis, II, a TBI forensic scientist, testified as an expert in the field of microanalysis. Agent Davis testified that he did not find any gunshot residue on the Defendant's clothing that was submitted for analysis.

Chad Johnson, a TBI forensic scientist, testified as an expert in the field of DNA analysis. Agent Johnson testified that he analyzed the Defendant's red Budweiser jacket, red t-shirt, white t-shirt, jeans, belt, bandana, and shotgun. Agent Johnson found blood present on the jacket and the red t-shirt. Agent Johnson was unable to match the DNA profile of the blood found on the jacket to either the Defendant or the victim, but the DNA profile from the red t-shirt matched the Defendant's DNA. Although no blood was found on the shotgun, Agent Johnson swabbed the stock of the gun and recovered a partial DNA profile which was consistent with the Defendant's DNA. Agent Johnson conducted a statistical evaluation of the match between the Defendant's DNA and the partial DNA profile from the shotgun and found that in the African-American general population, 1 out of 95,000 individuals would have that same partial profile.

On cross-examination, Agent Johnson testified that he did not find any of the victim's blood on the Defendant's jacket, shirt or pants.

Lieutenant Tyreece Miller, a Jackson Police Department officer, testified that he interviewed the Defendant on January 29, 2009. After a review of the Defendant's rights and an execution of a waiver of his rights, Lieutenant Miller said that he gave the Defendant the opportunity to tell him what had happened at the Jackson Family Fun Center on the night of January 28, 2009. The Defendant denied that he was present. He told Lieutenant Miller that he was in the area and heard the gunshot but was not at the Jackson Family Fun Center. Lieutenant Miller then told the Defendant that there was a surveillance recording of the incident, and the Defendant then responded that he was present at the shooting. The Defendant declined the opportunity to write out his statement about the incident due to his injured hand, so Lieutenant Miller wrote out the statement for the Defendant. Lieutenant Miller read into the record the following statement:

> I live in Memphis. I came to Jackson because I was looking at going to Lane College. There's a lot of people from my high school that go to school at Lane. I came to Jackson this past Tuesday, January 27th, 2009, with Marcellous McKinney. We went to high school together and he is my best friend. I brought a shotgun with me because I was just looking out for myself. I found it in some woods in my neighborhood. I decided to keep it for my protection.
>
> On Wednesday night[,] I rode to the bowling alley with some of my friends. We were in the blue truck. It was Marcellous, Herm, Junior and me. We went inside the bowling alley. We got our shoes, got a table and

10

started bowling. While we were bowling, a group of folks were standing there looking at us. I'm not from around here, so I was telling my friends that we just needed to leave.

We went outside and a group of other people followed us out. They started arguing with Herm or Junior. The argument was about gangs, but I wasn't arguing with them about gangs or my gang. I'm a Blood, and I think that Herm and Junior are crips, but I'm cool with them. The argument was about Herm and Junior false-flagging, which basically means they ain't real Crips. I wasn't with all that, so I walked on to the truck so I could just pick them up and we could leave.

I drove the truck on around and stopped right where the argument was. I saw the dude in the black shirt. He was walking like he was going to get something. I had my shotgun in the truck. I saw the dude in the black shirt hit two people, but I don't know who they were. He was looking at me like he was going to do something. I wanted to pull off, but I don't really know Jackson. I got the shotgun out of my truck. I went up to him and I shot him.
I took off running and I threw the shotgun over by the golf thing. I went back inside the bowling alley looking for my friends, but I didn't see them. The crowd was running out the exit doors by the golf thing, so I just ran with them. I got stopped by the police. They asked me if I had anything. I told him no. They let me get back in the truck with Marcellous. He was driving.

We drove to some apartments and this white dude answered the door. My hand was bleeding, but I don't remember how I hurt it. The white dude gave us a ride to Kroger. This dude named DeAngelo that goes to Lane picked us up from Kroger and drove us to his house on Hays. He was by himself when he picked us up. The police arrested me from DeAngelo's house. I was hiding in the closet because I was scared.

At the bottom of this statement, the Defendant signed and dated the statement. Lieutenant Miller testified that no other weapons were recovered from the scene, other than the Defendant's shotgun.

On cross-examination Lieutenant Miller testified that the interview was not recorded and that he wrote out the Defendant's statement for him.

The Defendant testified that, at the time of trial, he was twenty-one years old and had graduated from Oakhaven High School. After high school, the Defendant worked at

Williams-Sonoma in Memphis. The Defendant testified that, in January 2009, he came to Jackson to look at Lane College where his best friend, Marcellous McKinney, attended school. The Defendant said that he brought a gun with him to Jackson for "protection." He explained that he did so because he was, "coming to an environment I had no idea about." When the Defendant arrived at Conley's apartment, where he stayed during his visit, he put the gun in the closet and did not carry it with him when he visited the college campus.

The Defendant testified that, after visiting the campus during the day on Wednesday, a group decided to go to the Jackson Family Fun Center that night. The Defendant said that he took the gun with him to the Jackson Family Fun Center because he "didn't have a stable place" to keep it. The Defendant said that he did not actually take the weapon in to the Jackson Family Fun Center but left it in the back of Conley's truck. The Defendant recalled that he bowled and talked with friends that night. Twice he attempted to get into the karaoke bar where some of his friends were but he was underage at the time so he was not allowed to enter. The Defendant said that he did not realize there was any hostility between groups of people until later in the evening.

The Defendant testified that, at some point in the evening, he wanted to return to Conley's apartment to meet some "lady friends." The Defendant identified Herm, McKinney, Conley, Lorenzo and himself on the security video recording that showed the men exiting the Jackson Family Fun Center and walking toward Conley's truck. The Defendant testified that, at this point, he had no idea there was any "trouble." The Defendant got inside Conley's truck and was waiting for his friends to join him when he saw a large crowd forming in the parking lot. He then saw a man wearing a black shirt reach into a green vehicle and then walk toward the front of the bowling alley. At this point, the Defendant pulled Conley's truck in front of the bowling area entrance. As he pulled up, the Defendant saw a fight break out.

The Defendant testified that he did not know the victim and held no animosity toward the victim that night. The Defendant said that he watched the victim hit someone. The Defendant parked the car and approached the altercation with the shotgun because his best friend, McKinney, was in the area of the fight. The Defendant explained that he hoped that the fight might break up if "somebody" saw the gun. As he approached, he saw both McKinney and McKinney's brother, Lorenzo, fighting. Due to the large number of people fighting, the Defendant said he felt "scare[d]" and was concerned for McKinney. The Defendant said that the shotgun only had one round in it, and he planned on firing it into the air which he hoped would cause the crowd to scatter. The Defendant said that he did not intend to shoot anyone when he approached the fight with the shotgun. The Defendant said he walked toward McKinney when the victim approached him at a fast pace while reaching into his waist line. The Defendant testified that this "scare[d]" him and made him feel "threatened." The Defendant did not know whether the victim was the

12

same man that he earlier saw reach into the green vehicle. The Defendant said that when the victim was approximately ten feet from him, he fired at the victim. The Defendant said that he fired the shotgun "to protect [himself]." The Defendant said that he fled after shooting the victim because he was "scared." The Defendant agreed that he threw the gun down during his flight from the scene.

The Defendant testified that his arrest for this shooting was the first time he had ever been arrested. The Defendant recalled that Lieutenant Miller met with him the day after the shooting. As to this interview and what information was included in the statement, the Defendant said, " I was afraid to say anything I wanted to say, but I just wanted to cooperate with [Lieutenant Miller] where there won't be no misunderstandings. I just answered the questions that he asked me."

On cross-examination, the Defendant identified the shotgun police recovered from the "putt-putt" golf area of the Jackson Family Fun Center as his shotgun. The Defendant said that he found the shotgun in a "wooded area" of his neighborhood in Memphis, Tennessee. The Defendant initially denied checking to see if the gun was loaded, saying that he did not know how to check to see if the gun was loaded. Upon further questioning, the Defendant clarified that he did not check to see if the gun was loaded when he found it, but did so later. The Defendant said that he could not keep the gun in Conley's house, so without telling anyone, he placed it in the back of Conley's truck. The Defendant then explained that when he went out to Conley's truck and saw a man in a black shirt reach inside the green car, it raised his suspicion, so he took the gun from the back of the truck and then drove around to the bowling alley entrance. The Defendant again stated that he did not know if the man who reached in the green car was the victim. Further, he said that neither he nor his friends had any problem with the man who reached inside the green car.

The Defendant testified that he never saw the victim with a weapon. The Defendant agreed that he shot the victim with his shotgun but said that "it was just an honest mistake that was based on protecting myself." The Defendant testified that, after shooting the victim, he fled, threw the gun in the "putt-putt" golf area, and then found Conley's truck at the entrance of the parking lot. As he made his way to Conley's truck, a police officer stopped him and asked if he had a weapon. He told the police officer no, and the officer allowed him to get in Conley's truck and leave. The Defendant agreed that he did not tell the police officer that he had just shot someone. He explained that he did not do so because he was afraid of retaliation and wanted "to get away from the scene."

The Defendant testified that he removed his jacket after getting into Conley's truck to better see the extent of the injury to his hand, and he left the jacket in the back seat of Conley's truck when he got out at the apartment complex. The Defendant denied removing his jacket and leaving it in Conley's truck as an attempt to conceal his identity as the shooter.

13

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder and tampering with evidence. The trial court sentenced the Defendant to life in prison for the first degree premeditated murder conviction and a three-year concurrent sentence for the tampering with evidence conviction.

## II. Analysis

The Defendant asserts that the evidence at trial is insufficient to sustain his convictions and that the trial court erred in refusing to instruct the jury on defense of third persons.

## A. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to sustain his first degree premeditated murder conviction because the evidence did not establish that he killed the victim with premeditation. As to his tampering with evidence conviction, the Defendant contends that the evidence showed that he abandoned the weapon and, without more, the conviction cannot stand. The State counters that sufficient evidence was presented from which a reasonable juror could conclude that the Defendant committed first degree premeditated murder and tampering with the evidence.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *See also Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the

jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. First Degree Premeditated Murder

In this case, the jury convicted the Defendant of first degree premeditated murder. First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2010). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2010).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881

S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, considered in the light most favorable to the State, proves that the Defendant went to the Jackson Family Fun Center with his shotgun stored in Conley's truck. The Defendant was a member of one gang, the "Bloods", while another group of men at the bowling alley was affiliated with another gang, "the Crips." Throughout the evening a hostility developed between the two groups. As the Defendant and his friends exited the building, gang signs were flashed, and a group from the opposing gang followed the Defendant and his friends out to the parking lot. The Defendant, who was in possession of Conley's car keys, went to and got in the truck, watching from the parking space as a large group gathered and a fight broke out. The Defendant pulled the truck closer to the altercation and exited the car armed with his sawed-off shotgun. The Defendant entered the large crowd, walked toward the unarmed victim, pointed the shotgun at the victim's chest, and shot him. The Defendant then fled the scene, dropping the shotgun in a gated area and returning to the entrance of the bowling area to find his friends. A police officer stopped the Defendant. The Defendant denied possession of a weapon and then joined his friends in Conley's truck.

Considering the factors necessary to demonstrate premeditation, the Defendant first shot an unarmed victim. Thereafter, he attempted to conceal his crime by disposing of the weapon. He was calm following the killing, changing his clothes, leaving the car from the scene, and using a stranger's phone to make arrangements to go home. The Defendant and the victim's relationship was one of rival gang members and the killing occurred during a fight between the two gangs. *See Bland*, 958 S.W.2d at 660; *Nichols*, 24 S.W.3d at 302;. *Halake*, 102 S.W.3d at 668. We conclude that these factors support the jury's finding that the Defendant acted with premeditation when he killed the victim. Accordingly, we conclude that the evidence is sufficient to support the conviction for first degree premeditated murder beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

**2. Tampering with Evidence**

To convict the Defendant of tampering with evidence, the State needed to establish,

beyond a reasonable doubt, that the Defendant, knowing that an investigation or official proceeding was pending or in progress, altered, destroyed, or concealed any record, document, or thing with the intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding. T.C.A. § 39-16-503(a)(1) (2010).

The Defendant asserts that he merely abandoned evidence as he fled, and such action does not constitute tampering with evidence. The State responds that the Defendant's conduct of concealing the weapon at a location away from the shooting, thereby preventing police officers from recovering the murder weapon, is sufficient evidence to sustain the Defendant's conviction.

The evidence, considered in the light most favorable to the State, shows that the Defendant, after shooting the victim, ran away from the scene of the crime. The Defendant threw the gun over a fence in the putt-putt golf area of the Jackson Family Fun Center, away from the entrance to the bowling alley where the shooting occurred. The Defendant then returned back to the bowling alley area to look for his friends before finding them in Conley's vehicle at the entrance to the Jackson Family Fun Center parking lot. A police officer stopped the Defendant before he could get into Conley's vehicle and asked if the Defendant had a weapon on him. The Defendant told the officer no. Based upon this response, the police officer then allowed the Defendant to get into Conley's truck and leave the scene. This evidence supports a jury's finding that the Defendant attempted to conceal the weapon from police officers investigating the homicide.

The Defendant relies upon *State v. Patton*, in his assertion that he merely abandoned the property. *State v. Patton*, 898 S.W.2d 732 (Tenn. Crim. App. 1994). In *State v. Patton*, the defendant was a participant in an undercover drug sale. *Id.* at 734. When the police initiated an arrest, the defendant fled and in the presence of police officers pursuing him threw down a bag of marijuana. *Id.* This Court held that the trial court properly dismissed an indictment charging the defendant with tampering with evidence because the defendant's act of tossing aside a bag of marijuana during police pursuit constituted "'mere abandonment' of contraband." In the present case, the Defendant was not in the presence of police officers when he threw the gun in a location away from the shooting. His disposal of the weapon allowed him to, shortly thereafter, tell police officers that he had no weapon, which ultimately provided his opportunity to leave the scene of the crime.

17

Accordingly, we conclude that the evidence is sufficient to support the conviction for tampering with evidence beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue

## B. Jury Instructions

The Defendant contends that the trial court erred in refusing to instruct the jury on the defense of a third person, an affirmative defense. The State responds that the facts presented at trial did not warrant this instruction and, thus, the trial court did not err in refusing to give this instruction to the jury.

A trial court has a "duty to give a complete charge of the law applicable to the facts of the case." *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). However, Tennessee law does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). In determining whether jury instructions are erroneous, this Court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998).

The defense of self-defense is expressly provided for in Tennessee by statute and is defined, in relevant part, as follows:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611 (2010).  Tennessee Code likewise provides for the defense of defense of person(s):

A person is justified in threatening or using force against another to protect a third person, if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39–11–611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

T.C.A. § 39-11-612(b)(2) (2010).

"In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001) (citing *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn.1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)).  When the entire charge, read as a whole, fully and fairly sets out the applicable law, the trial judge does not err in denying an inaccurate or inapplicable instruction to the case when the charge, in its entirety, "fully and fairly sets out the applicable law." *Id.* (citing *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987)).

The Defendant requested that the trial court charge the jury as to defense of third person(s). The trial court denied this request stating:

> If you look to the evidence in this case as it relates to this issue, the Defendant clearly testified that he was defending himself. It was just to protect himself. He was afraid for his own safety. I'm using the Defendant's testimony. Defendant's claimed defense, he said, "I shot the victim," he called him by name, "to protect myself," and that's a quote. He went on to say, "It's all about a claim of self-defense." That what the Defendant is making here. He at no time claimed that other than saying he was concerned about his friends. He used the word[s] "concerned about my friends" when he got out of the car, but that testimony alone, being concerned about his friends, would not justify a third-party defense claim.

The evidence, viewed in the light most favorable to the Defendant, shows that the Defendant saw his best friend Marcellous McKinney fighting. He exited Conley's truck with his shotgun and walked toward McKinney. The victim approached the Defendant and the Defendant shot the victim, allegedly to "protect" himself. There was no evidence to support that the Defendant had a "reasonable belief" that McKinney was in "imminent danger of death or serious bodily injury." Moreover, the Defendant testified that he shot the victim to protect himself. Based upon these facts, the trial court did not err in declining to give the third person defense instruction. Further, we conclude that the jury instructions provided by the trial court "fully and fairly set[ ] out the applicable law" as to self-defense. *Sims*, 45 S.W.3d at 9.

Based upon the foregoing, we conclude that the trial court properly charged the jury as to self-defense in this case. We, therefore, affirm the judgments of the trial court.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

20

_____
ROBERT W. WEDEMEYER, JUDGE